UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNNELL DARRELL CARTER,

        Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

Case No. 13-12745

Paul D. Borman
United States District Judge

OPINION AND ORDER:
(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 8) AND (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 9)

      Plaintiff Lynnell Darrell Carter brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") that denied both his application for disability insurance benefits and also his application for supplemental security income pursuant to the Social Security Act (the "Act"). The parties have filed cross-motions for summary judgment. (ECF Nos. 8, 9.)

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Plaintiff is not disabled under the Act. Therefore, the Court will deny the Plaintiff's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).

I. BACKGROUND

A.      Procedural History

Plaintiff filed his applications for supplemental social security income and disability insurance benefits on June 14, 2010. (Tr. 19, 130-36, 137-40). Plaintiff claimed disability based on daily headaches, back pain, hypertension, hepatitis, coronary artery disease ("CAD"), gastroesophageal reflux disease ("GERD"), and post-traumatic stress disorder ("PTSD"). (Tr. 21-22). Plaintiff alleged a disability onset date of February 1, 2004 in both of his applications. (*Id.*) These claims were initially denied on October 22, 2010 (Tr. 62, 63, 64-73) and Plaintiff requested a hearing on December 10, 2010 (Tr. 74-75). Then, on October 3, 2011, ALJ Elliot Bunce held a video hearing during which Plaintiff appeared and testified. (Tr. 36-53). Plaintiff was represented by an attorney at the hearing, and Judith Findora, a vocational expert, also appeared and testified. (Tr. 53-59).

On January 31, 2012, ALJ Bunce issued his decision and found Plaintiff not disabled because he could perform a significant number of medium exertional jobs in the economy. (Tr. 19-29). This decision became the Commissioner's final decision when the Appeals Council declined Plaintiff's request for review on April 17, 2013. (Tr. 1-4). Plaintiff then filed the present action on June 21, 2013. (ECF No. 1, Compl.).

B.      Medical History and Report from Medical Consultant

Plaintiff's medical record begins with a visit to the Hamilton Clinic ("Hamilton") on June 25, 2009, where he presented with frequent heartburn. (Tr. 207-08). Plaintiff did not complain of any pain. (Tr. 207). Plaintiff's blood pressure was 144/86. The doctor also noted that Plaintiff was not checking his blood pressure at home but he was taking his medications as

prescribed. (*Id*.). Plaintiff did not report any complaints specific to his hepatitis diagnosis at this visit. (*Id*.). At that visit, the doctor diagnosed Plaintiff with hypertension, GERD, and Hepatitis C. (Tr. 207). The doctor noted Plaintiff should return for a follow up appointment in two to three weeks, however, there is nothing in the record indicating that the follow up appointment took place. (*Id*. at 208).

Plaintiff returned to Hamilton on October 19, 2009 and presented with periodic heartburn and abdominal bloating but did not complain of any pain. (Tr. 25-26, 205-06). Plaintiff indicated that he was taking his scheduled medications as prescribed and also admitted to occasional alcohol use. (Tr. 205). The doctor indicated that his review was otherwise "negative". (*Id*.). Plaintiff's blood pressure was 150/84 and supported the doctor's continued diagnosis of hypertension. (Tr. 205-06). Plaintiff also exhibited mild middle epigastric pain upon palpitation, leading the doctor to continue his diagnosis of GERD. (*Id*.). The doctor also continued his diagnosis of hepatitis C based on those same symptoms. (*Id*.).

Plaintiff next visited Hamilton on December 23, 2009 for prescription refills and for lab results. (Tr. 25-26, 203-04). Plaintiff's blood pressure was normal, 118/76, and he reported taking his medications as prescribed and only using alcohol occasionally. (Tr. 203). Plaintiff further stated that he could not check his blood pressure at home. The doctor noted that Plaintiff had no physical complaints and reported no pain. (*Id*.). The doctor continued Plaintiff's diagnosis of hypertension and hepatitis C. (*Id*. at 204).

Then, on March 22, 2010, Plaintiff visited Hamilton for prescription refills. (Tr. 25-26, 201-02). The doctor noted that Plaintiff had not been to Hamilton for four months and Plaintiff admitted to being non-compliant in taking his medication. (Tr. 201). Plaintiff again stated that

3

he did not check his blood pressure at home. (*Id.*). Plaintiff's blood pressure was taken at the exam and it was found to be high, 180/90, which supported not only Plaintiff's failure to take blood pressure medication but also supported the doctor's continued diagnosis of hypertension. (Tr. 201-02). Plaintiff did complain of any pain or gastrointestinal issues during the March 22, 2010 visit. (*Id.*).

At a follow-up appointment at Hamilton on April 23, 2010, Plaintiff stated he was taking his medications as prescribed. (Tr. 25, 199-200). Plaintiff's blood pressure was taken and found to be 180/94 which supported the doctor's continue diagnosis of hypertension. (Tr. 200). Plaintiff also admitted that he drank three packs of alcohol a week and also used marijuana. (Tr. 199). Plaintiff noted that he had no blood in his stool, no pain or indigestion, no changes in his vision, no edema and was tolerating Zantac well. (*Id.*). The doctor continued his diagnosis of GERD and hypertension and also noted that he had counseled Plaintiff on the risks of marijuana and encouraged him to quit using it. The doctor also discussed the risks versus benefits of continued compliance with his hypertension medication and encouraged Plaintiff to take his medication as prescribed. (Tr. 200).

Plaintiff's last visit to Hamilton was on May 25, 2010. (Tr. 25, 197-98). Plaintiff presented for a blood pressure check and for a prescription refill. (Tr. 197). Plaintiff did not complain of any pain and had a more normal, but still high, blood pressure reading of 136/86. (Tr. 25, 197). Plaintiff also noted that he was taking his medication as prescribed and admitted that he used alcohol and marijuana. (Tr. 197). The doctor continued his diagnosis of hypertension and also diagnosed Plaintiff with coronary artery disease ("CAD"). (Tr. 200).

On September 1, 2010, Plaintiff visited the VA Hospital in Saginaw, Michigan and

4

received a mental health initial assessment from Thomas F. Tumicki, LMSW. (Tr. 239-46). Plaintiff noted that he had daily anxiety attacks, obsession, difficulty falling asleep, and waking early and not being able to return to sleep. (Tr. 26, 240, 242). Plaintiff also stated that he had recently started sleeping with a pistol. (Tr. 242). Plaintiff also complained (for the first time) of headaches but indicated that he was satisfied with his pain management interventions at that time. (Tr. 241). In detailing his history of substance abuse, Plaintiff admitted that he stopped using cocaine and crack in 2004, he had not used heroin since 1978 or 1979, but that he consumed 48 ounces of beer every other day or so, and continued to use marijuana to "mellow" him out and ease his headaches. (Tr. 241). Plaintiff further stated that he had experienced a traumatic event when he thought his life was in danger, as well as witnessing an event in which someone else's life seemed to be in danger, and also experienced traumatic events in which he or someone else was seriously injured or could have been seriously injured. (Tr. 242). Plaintiff was diagnosed with PTSD. (Tr. 245). The counselor found that Plaintiff's PTSD symptoms were related to his experiences in the military and when, at age fourteen, he witnessed someone stab a man to death. (Tr. 242). Plaintiff stated that his reactions to these traumas were feelings of being frightened and horrified. (*Id*.).

On August 23, 2011, Plaintiff again visited the VA Hospital in Saginaw, Michigan and received a "clinical and social summary" as well as a mental health assessment. (Tr. 225-37, 255-259). During the medical work up, Plaintiff noted that he had a long history of hypertension but denied any chest pain or palpations, cough or labored breathing. (Tr. 255). Plaintiff stated that he did not smoke cigarettes but did smoke marijuana on a "routine basis". (Tr. 255). Plaintiff also reported drinking 6 to 8 beers a week, but noted that he drinks one or two 24 ounce

5

beers in a day. (Tr. 255). Plaintiff also described his indigestion (or dyspepsia) as "occasional" and that he was taking omeprazole to control it. His blood pressure was 147/97. (Tr. 256). Plaintiff was diagnosed with hypertension and substance abuse by Jennifer M. Tunny, a family nurse practitioner. (Tr. 259).

Plaintiff had a transthoracic echo on September 2011 that found normal left ventricular size and systolic function, and stage one diastolic dysfunction, mild concentric left ventricle hypertrophy, mild mitral regurgitation, mild tricuspid regurgitation, and pulmonary artery systolic pressure. (Tr. 26, 261).

On October 18, 2010, a Disability Determination Services medical consultant, Mila Bacalla, M.D., issued an RFC assessment of Plaintiff based on Plaintiff's medical record. Dr. Bacalla noted that Plaintiff was alleging disability due to high blood pressure, irregular heart beat, breathing shortage and chronic headaches. (Tr. 211-17). That RFC assessment noted that Plaintiff could occasionally lift 50 pounds or more, frequently lift 25 pounds or more, stand and/or walk with normal breaks for a total of about 6 hours a day in an 8-hour work day. (Tr. 212). The RFC assessment also reflected that Plaintiff could push or pull (including using hand/foot controls) for an unlimited amount of time, and that he had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 212-15). Dr. Bacalla further noted that while Plaintiff alleged he had limitations regarding his ability to bend, stand, reach, hear, walk and kneel, there was no support for those allegations in his limited medical record. (Tr. 216). Finally, Dr. Bacalla concluded that Plaintiff's medical record was devoid of any treating or examining source statements regarding Plaintiff's physical capabilities. (Tr. 216).

D. Testimony at the Hearing before the ALJ

1. Plaintiff's testimony

At the time of the October 3, 2011 hearing before the ALJ, Plaintiff testified that he was 54 years old and lived in a house with his daughter, his daughter's mother, and her other son. (Tr. 40-41). Plaintiff testified that he had received his GED while in the military. (Tr. 42).

In terms of Plaintiff's alleged disabilities, Plaintiff testified that he suffered from pain in his lower back and also from daily headaches. (Tr. 45). Plaintiff described the headaches as lasting 24 hours a day and speculated that the headaches were caused by a combination of things, including his blood pressure medication and a previous assault which resulted in a head injury. (*Id.*). Plaintiff testified that his back pain caused him to constantly readjust his position and was likely due to his previous work as a roofer. (Tr. 45). Plaintiff also testified that he suffered from chest pains at least three to four times a week. (Tr. 45-46).

Plaintiff further testified that he has a tendency to be forgetful and had problems maintaining focus. (Tr. 49). Plaintiff testified that he had never had a problem with alcohol abuse and estimated that he consumed three or four cans of beer per week. (Tr. 49). He also admitted that he has occasionally used marijuana. (*Id.*).

In terms of functional capacity, Plaintiff testified that he has his driver's license and drives approximately one or two hours a day. (*Id.*). Plaintiff testified that he worked briefly and on a very part time basis as a stocker at a dollar store until 2007, but otherwise had not been employed for seven years. (Tr. 42-43). Plaintiff testified that he would occasionally cut his lawn and wash his dishes. (Tr. 43). He also did his own grocery shopping and made his own meals. (*Id.*). Plaintiff told the ALJ that he could lift about ten pounds frequently throughout an

eight-hour workday, walk for ten minutes at a time, stand for fifteen or twenty minutes, and sit for one to two hours at a time. (Tr. 49-51). Plaintiff also testified that he had problems sleeping through the night because he suffers from flashback nightmares. (Tr. 52). Plaintiff explained that he is tired during the day because he does not sleep well and because he is short of breath. (Tr. 52-53). Plaintiff also stated that he took two or three naps per day and each nap is approximately an hour long. (Tr. 53).

Regarding medications, Plaintiff testified that his high blood pressure is not controlled by medication even when he takes his medication as prescribed. (Tr. 46-47). Plaintiff also indicated at the hearing he takes medication for PTSD as prescribed by the VA hospital.

2. Vocation Expert's Testimony

The ALJ also solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations similar to those of Plaintiff.

The ALJ inquired about job availability for a hypothetical individual of Plaintiff's age (54), education (GED, or high school diploma equivalent), and work experience who was able to perform work at the medium exertional level that consists of no more than simple, routine, repetitive tasks with one or two-step instructions; that did not impose strict production quotas; did not require interaction with the public to perform any job duties. (Tr. 55-56).

The VE testified that such an individual could find work as a cleaner, i.e. a janitor or a housekeeper. (Tr. 56). The VE further testified that, in the lower peninsula of Michigan, there were approximately 44,000 of these jobs and approximately 1,475,000 of those jobs nationally. (*Id*.). The VE also testified that such an individual could also find work as a dishwasher and there were approximately 8,600 of those jobs regionally and 278,000 nationally. (*Id*.).

## II. APPLICATION OF THE DISABILITY FRAMEWORK

Under the Act, Disability Insurance Benefits (for those qualifying wage earners who become disabled prior to the expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "[D]isability" is defined in the Act, as the: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Bunce found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 1, 2004. (Tr. 21). At step two, he found that Plaintiff had the following severe impairments: GERD, hypertension, hepatitis, coronary artery disease ("CAD"), post-traumatic stress disorder ("PTSD"), substance addiction. (Tr. 21-22). Then, the ALJ noted that while the Plaintiff testified that he had headaches 24 hours per day and that he suffered from back pain, there was "no significant objective evidence regarding his headaches or an etiology to support his back pain." (Tr. 22). Accordingly the ALJ found that those alleged impairments could not be found to be severe. (*Id.*). Next, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 22-24).

Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform "work that does not require exertion above the medium level as defined in 20 CFR 404.1567(c) and 416.967(c), or more than simple, routine, repetitious tasks, with one- or two-step instructions, or any interaction to perform job duties." (Tr. 24-27). At step four, the ALJ found that Plaintiff had past relevant work as a construction laborer. (Tr. 27). However, the ALJ noted that the vocational expert ("VE") found that Plaintiff's past work was rated at the heavy exertional level, which exceeded Plaintiff's RFC for medium exertional

level work. (*Id*.). Accordingly, the ALJ found that Plaintiff was unable to perform his past relevant work. (*Id*.).

At step five, the ALJ concluded, based in part on the VE's testimony, that jobs existed in significant numbers in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 27-28). Accordingly, the ALJ found that Plaintiff was not disabled as defined by the Act from the alleged onset date through the date of the ALJ's decision, January 31, 2012. (Tr. 28).

## III. STANDARD OF REVIEW

Where a party has objected to portions of a Magistrate Judge's Report and Recommendation, the Court conducts a *de novo* review of those portions. FED. R. CIV. P. 72(b); *Lyons v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 659, 661 (E.D. Mich. 2004). In reviewing the findings of the ALJ, the Court is limited to determining whether those findings are supported by substantial evidence and made pursuant to proper legal standards. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ... "); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (quoting *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009)); *see also McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008) (recognizing that substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotations omitted). "If the Commissioner's decision is supported by substantial

evidence, we must defer to that decision, 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (quoting *Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005)). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247.

Only those objections that are specific are entitled to a *de novo* review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Id.* (internal quotation marks and citation omitted). A non-specific objection, or one that merely reiterates arguments previously presented, does not adequately identify alleged errors on the part of the magistrate judge and results in a duplication of effort on the part of the district court: "[a] general objection to the entirety of the magistrate's report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless." *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

## IV. ANALYSIS

Plaintiff alleges that the ALJ erred as a matter of law in failing to properly evaluate the medical records and opinions of evidence and as a result formed an inaccurate hypothetical that did not accurately reflect Plaintiff's impairments. In making his argument, Plaintiff appears to be arguing (1) that the ALJ erred in evaluating the medical record and opinion evidence and (2) that the ALJ's hypothetical conflicted with Plaintiff's testimony regarding his limitations.

There is no dispute that under the disability framework, once the ALJ determined that

Plaintiff could not perform his past relevant work, the burden shifted to the ALJ to show that "plaintiff possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Varley v. Sec'y of Health and Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). In order for an ALJ to meet his burden, the ALJ may rely upon a VE's testimony, however, "the testimony must be given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Brock v. Com'r of Soc. Sec.*, 368 F. App'x 622, 625-27 (6th Cir. 2010) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

In the instant case, Plaintiff has failed to identify or point to any flaw in the ALJ's hypothetical with any degree of specificity. Indeed, Plaintiff properly notes that an RFC assessment must "always consider and address medical source opinions" and if the RFC assessment "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Soc. Sec. Ruling 96-8p, 1996 WL 374184, * 7 (July 2, 1996). However, Plaintiff failed to explain or note any medical opinion or evidence that contradicts the ALJ's RFC limitations. The ALJ explicitly relied upon the RFC assessment of Dr. Bascalla in forming his hypothetical regarding Plaintiff's physical limitations. Further, there does not appear to be anything in the medical record (opinion or test result) that contradicts the RFC assessment of Dr. Bascalla. Further, the ALJ considered the implications of Plaintiff's mental impairments by limiting him to no more than simple, routine, repetitive tasks with no more than one or two-step instructions. (Tr. 23, 27-28, 55). Therefore, where Plaintiff has failed to point to any contradicting medical evidence or opinions, the Court rejects Plaintiff's argument as

without merit.

To the extent Plaintiff appears to argue that the ALJ was remiss in forming his hypothetical because it conflicted with Plaintiff's own testimony that he suffered from "head and back pain" and needed to take multiple naps a day, this argument is also spurious. While not cited by Plaintiff, the VE was asked by Plaintiff's counsel whether a person whose concentration was so deficient that he would be off-task for 20% of a work day. (Tr. 58). The VE testified that if that meant the person would miss one day of work each week, then that limitation would be work preclusive. (*Id.*). Further, the VE was asked by Plaintiff's counsel to consider whether there were any jobs in the economy for someone like Plaintiff who also needed to nap for two or three times each workday beyond the breaks or lunch period a worker was normally provided. (Tr. 58). The VE testified that there were no such jobs available. (*Id.*). However, there is nothing in the record that substantiates either of these limitations, and Plaintiff does not even cite to the cross-examination of the VE in his motion. Moreover, the Court notes that there is nothing in the medical record (objective evidence or opinion) that supports Plaintiff's general claims of back pain and headaches. (Tr. 22). Indeed, Plaintiff never once mentioned that he suffered any pain (in his head or his back) whatsoever until he visited the VA Hospital for the first time in August 2011.

Finally, while Plaintiff contends that his back and neck pain keeps him from performing the "necessities of every-day life", this argument is contradicted by Plaintiff's own testimony. Indeed, Plaintiff himself testified that he can cut the grass occasionally, wash his own dishes, drive for up to two hours a day, grocery shop, and make all his own meals. This testimony supports the ALJ's finding that Plaintiff's activities of daily activities were only mildly

restricted. (Tr. 23). Therefore, the Court rejects Plaintiff's arguments where he has set forth only general and unsubstantiated arguments, failed to contradict any of the limitations the ALJ set forth in his hypothetical to the VE, or even attempt to cite the medical record.

In summary, the ALJ's hypothetical to the VE was accurate as evidenced by the ALJ's reliance on the RFC assessment of Dr. Bacalla, and the ALJ's incorporation of limitations reflect Plaintiff's mental impairments. The VE's opinion therefore constituted "substantial evidence" to support the ALJ's determination that Plaintiff was not disabled. Accordingly, the ALJ met his burden at step five of proving that a significant number of jobs existed in the national economy for Plaintiff.

## V. CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 8), GRANTS the Commissioner's Motion for Summary Judgment (ECF No. 9).

IT IS SO ORDERED.

s/Paul D. Borman  
PAUL D. BORMAN  
UNITED STATES DISTRICT JUDGE

Dated: December 1, 2014

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 1, 2014.

s/Deborah Tofil  
Case Manager